UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WILMINGTON DIVISION
No.: 7:08-cv-00197-D

| | |
|---|---|
| EARL CLYDE KELLY, on behalf of) himself and all others similarly situated, )<br>)<br>   Plaintiffs, )<br>)<br>v. )<br>)<br>GEORGIA-PACIFIC LLC and )<br>GEORGIA PACIFIC WOOD )<br>PRODUCTS LLC, )<br>)<br>   Defendant and Third-Party )<br>   Plaintiffs, )<br>)<br>v. )<br>)<br>WALTER THORPE MCCARTNEY, )<br>d/b/a SCOTT MCCARTNEY & )<br>ASSOCIATES and JOHN DOE Nos. 1 )<br>through 500, )<br>)<br>   Third-Party Defendants. )<br>_____) | **AMENDED COMPLAINT** |

Plaintiff Earl Clyde Kelly ("Plaintiff"), by and through his undersigned counsel, on behalf of

himself and all other persons and entities similarly situated, allege the following facts and claims

upon knowledge as to matters relating to himself and upon information and belief as to all other

matters and, by way of this Complaint, avers as follows:

## INTRODUCTION AND SUMMARY OF ACTION

1.   This is an action asserting claims for breach of express warranty, breach of implied

warranty, negligence *per se* and unfair and deceptive acts and practices in connection with defective

{00360564.PDF}

Georgia-Pacific PrimeTrim trimboard ("PrimeTrim," "product" or "trimboard"). Georgia-Pacific, LLC and Georgia-Pacific Wood Products, LLC (hereinafter collectively referred to as "GP" or "Defendants") designed, manufactured, tested, marketed, advertised, warranted and sold for use as fascia, soffit, corner board, window trim, door trim and general exterior use on homes, apartments, condominiums, buildings, and other structures in North Carolina and throughout the United States.

2.     However, PrimeTrim is inherently defective and violates the building code because it buckles, cracks, chips, shrinks, swells when exposed to water and causes damage to both itself and any material to which it is attached.

## JURISDICTION AND VENUE

3.     The subject matter jurisdiction over this action and personal jurisdiction over GP is conferred upon and vested in this Court under and by virtue of N.C.G.S. §§ 1-75.4, 7A-240 and 7A-243 and 28 U.S.C. §§ 1332, 1446.

4.     Venue for this action is properly laid in this Court pursuant to and in accordance with N.C.G.S. §§ 1-76, 1-77, 1-79, 1-80 and 1-82.

## THE PARTIES

5.     Plaintiff, and at all relevant times hereto, has been a citizen and resident of New Hanover County, North Carolina. Specifically, Plaintiff resides at 903 Grand Bahama Drive, Carolina Beach, North Carolina ("Plaintiff's residence"). The certificate of occupancy for Plaintiff's residence was issued on December 19, 2003.

6.     Walter Thorpe McCartney d/b/a Scott McCartney ("Plaintiff's Builder") is a North Carolina resident. Specifically, Plaintiff's Builder lives at 8457 River Road, Wilmington, North

Carolina 28412.

7.      Defendants Georgia-Pacific, LLC and Georgia-Pacific Wood Products, LLC are limited liability companies organized and existing under the laws of the State of Delaware with their headquarters located in Atlanta, Georgia.

8.      GP holds itself out to both the construction industry and the public at large as being knowledgeable in the design and manufacture of exterior building products and as being providers of quality building products, including the exterior trim product that is the subject of this litigation.

## CLASS ACTION ALLEGATIONS

9.      Plaintiff brings this class action pursuant to G.S. §1A-1, Rule 23 on behalf of himself and a Class defined as follows:

> All persons in the State of North Carolina who own a home,
> or other structure, on which GP's PrimeTrim is installed.

Excluded from the Class are: (a) any Judge or Magistrate presiding over this action and members of their families; (b) GP and any entity in which GP has a controlling interest or which has a controlling interest in GP and its legal representatives, assigns and successors of GP; and (c) all persons who properly execute and file a timely request for exclusion from the Class.

10.      *Numerosity*:   The Class is composed of thousands of persons geographically dispersed throughout the State of North Carolina, the joinder of whom in one action is impractical. Moreover, upon information and belief, the Class is ascertainable and identifiable from GP's records or identifying marks on the PrimeTrim.

11.      *Commonality*:   Questions of law and fact common to the Class exist as to all members of the Class and predominate over any questions affecting only individual members of the

{00360564.PDF}

–3–

Class.  These common legal and factual issues include the following:

a. Whether the PrimeTrim is inherently defective;

b. Whether the PrimeTrim has not or will not perform in accordance with the reasonable expectations of ordinary consumers;

c. Whether the PrimeTrim conforms to the applicable building code and/or relevant standards;

d. Whether GP knew or should have known of the defect;

e. Whether GP concealed from consumers and/or failed to disclose to consumers the defect;

f. Whether GP failed to provide adequate installation instructions;

g. Whether GP failed to properly anticipate the use and integration of other building components, such as windows, in its installation instructions;

h. Whether GP's limitations on its express warranty are unconscionable;

i. Whether GP failed to properly disclaim any limitation to pay for installation of replacement trimboard;

j. Whether GP failed to warn of potential defects in its product or omitted critical information regarding defects in its product in its marketing, sales and installation materials;

k. Whether GP breached implied warranties of merchantability and fitness for a particular purpose;

l. Whether Plaintiff and the Class are entitled to compensatory damages, including, among other things: (i) compensation for all out-of-pocket monies expended by members of the Class for replacement of the PrimeTrim and/or installation costs; (ii) the failure of consideration in connection with and/or difference in value arising out of the variance between the PrimeTrim as warranted and the PrimeTrim containing the defect; and (iii) the diminution of resale value of the residences and buildings resulting from the defect in the PrimeTrim;

m. Whether Plaintiff and the Class are entitled to all costs associated with replacement of their defective PrimeTrim with non-defective trimboard;

n. Whether Plaintiff and the Class are entitled to restitution and/or disgorgement;

o. Whether Plaintiff and the Class are entitled to specific performance of the warranty;

p. Whether Plaintiff and the Class Members were third-party beneficiaries of the contracts entered into between GP and Plaintiff's and Class Members' builders;

q. Whether Plaintiff and Class Members would have purchased their homes, or whether they would have paid a lower price for their homes, had they known of the defective nature of the PrimeTrim used on their homes.

12. *Typicality*: Plaintiff's claims are typical of the claims of the members of the Class, as all such claims arise out of GP's conduct in designing, manufacturing, marketing, advertising, warranting and selling the defective PrimeTrim and GP's conduct in concealing the defect in the PrimeTrim to owners, contractors, developers, and suppliers.

13. *Adequate Representation*: Plaintiff will fairly and adequately protect the interests of the members of the Class and has no interests antagonistic to those of the Class. Plaintiff has retained counsel experienced in the prosecution of complex class actions, including consumer class actions involving breach of warranties, product liability and product design defects.

14. *Predominance and Superiority*: This class action is appropriate for certification because questions of law and fact common to the members of the Class predominate over questions affecting only individual members, and a Class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable. Should individual Class members be required to bring separate actions, this Court and courts throughout North Carolina would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer

{00360564.PDF}

management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court.

## **COMMON FACTUAL ALLEGATIONS**

15.     Upon information and belief, GP has sold, directly or indirectly (through dealers and other retail outlets), thousands of PrimeTrim boards nationwide and in the state of North Carolina to homeowners, developers, contractors and/or subcontractors.

16.     As defined by North Carolina General Statutes § 99B-1, GP is both a "manufacturer" and a "seller."

17.     Upon information and belief, GP, through a distributor, designed, manufactured, marketed, advertised, warranted and sold PrimeTrim to Plaintiff or Plaintiff's builder, Walter Thorpe McCartney ("Plaintiff's Builder"), his subcontractors, and/or agents, and the PrimeTrim was installed on Plaintiff's Residence.

18.     Upon information and belief, GP, through a distributor, designed, manufactured, marketed, advertised, warranted and sold PrimeTrim to Class Members, Class Members' builders, contractors,  subcontractors, and/or agents, and the PrimeTrim was installed on Class Members' Residences.

19.     Upon information and belief, Plaintiff and Class Members are either in privity with GP or are third-party beneficiaries between the contracts entered into between Plaintiff's and Class Members' builders, contractors, subcontractors, and/or agents and GP.

20.     Upon information and belief, Plaintiff and Class Members are third-party beneficiaries of the contracts entered into between GP and Plaintiff's and Class Members' builders

{00360564.PDF}

because Plaintiff and Class Members received the direct benefit of those contracts. GP and Plaintiff's and Class Members' builders intended for Plaintiff and Class Members to directly benefit from these contracts given that the Primetrim was to be installed on Plaintiff's and Class Members' homes.

21.    Upon information and belief, GP provided an express warranty to Plaintiff and Class Members and the owners of the homes on which PrimeTrim was installed and/or applied. A true and accurate copy of at least one version of the warranty is attached hereto as Exhibit A and incorporated herein by reference.

22.    In conjunction with each sale and through various forms of media, GP marketed, advertised and warranted that the PrimeTrim was fit for the ordinary purpose for which such goods were used and was free from defects in materials and workmanship.

23.    At the time of construction of Plaintiff and Class Members' residences, the North Carolina Building Code–Residential Code 2002 ("NCRC") was the applicable building code. The NCRC incorporates by reference North Carolina Administration and Enforcements Code ("NCAERC"), the 2000 International Building Code ("IBC") and the International Residential Code ("IRC").

24.    Section R701 of the 2002 NCRC states that "The Provisions of this chapter shall control the design and construction of the interior and exterior wall coverings for all buildings."

25.    However, there is no applicable provision in the NCRC regarding the installation or manufacture of PrimeTrim or trimboard.

26. The NCAERC which states in Section 205.1 Alternative Material, Design and Methods:

> The provisions of this code are not intended to prevent the use of any alternate material, design, or method of construction, provided that the alternate had been reviewed and approved by the Code Enforcement Official at his sole discretion … The Code Enforcement Official may require that sufficient evidence or proof be submitted to substantiate any claim made regarding the alternative material, design and methods.

27. Section 205.2 Test or Analysis states, "The Code Enforcement Official may require tests, test reports or specific analysis as proof of compliance. . ."

28. However, upon information and belief, GP did not get approval from a Code Enforcement Official to install PrimeTrim on homes.

29. In its materials, GP marketed, advertised and warranted that "PrimeTrim may be installed wherever non-structural wood trim can be used" and that since it has been engineered, "PrimeTrim has none of the normal defects found in lumber, such as knots, splits, checks and wane."

30. In its marketing materials and advertisements, GP makes the following representations:

    a.    "PrimeTrim offers up to four times more decay resistance than lumber."

    b.    "PrimeTrim outperformed lumber through two years of direct exposure to sun, rain, and snow."

    c.    "PrimeTrim [is] more durable than traditional lumber."

    d.    PrimeTrim has "more than fifteen years with a track record of proven performance."

    e.    "There's virtually no waste due to material defects."

    f.    PrimeTrim "looks great for years without frequent repainting, helping

{00360564.PDF}

homeowners save money on maintenance."

    g.     "Engineered to withstand sun, rain, snow and time."

31.    Upon information and belief, GP knew that, Plaintiff, Plaintiff's builder, Plaintiff's subcontractors, and/or agents as well as Class Members, Class Members' builders, contractors, subcontractors, and/or agents would rely upon GP's representations, marketing and warranties regarding the quality of PrimeTrim.

32.    Upon information and belief, Plaintiff, Plaintiff's builder, Plaintiff's subcontractors, and/or agents as well as Class Members, Class Members' builders, contractors, subcontractors, and/or agents relied upon GP's representations, marketing and warranties when purchasing the PrimeTrim.

33.    Contrary to GP's representations, however, PrimeTrim is not more durable than traditional lumber, does not look great for years without frequent repainting or caulking, does not withstand the sun, rain, snow or time. Indeed, PrimeTrim, at the time of leaving GP's control, contains a defect because it prematurely deteriorates, rots, swells, buckles, delaminates, absorbs water, warps, and/or bulges under normal conditions and natural, outdoor exposure; causes consequential water and structural damages; and promotes the growth of mold, mildew, fungi, and insect infestation in the structures in which it is installed. At the time of sale, the PrimeTrim contained design and construction defects that resulted in deterioration and loss of structural integrity. The defects reduced the effectiveness and performance of the PrimeTrim and rendered it unable to perform the ordinary purposes for which it was used.

34.    After installation, the deficiencies in the PrimeTrim become apparent because water and moisture penetrate behind the PrimeTrim which, in turn, allows moisture to penetrate the

{00360564.PDF}

PrimeTrim.  The absorption of water and moisture result in the swelling of the PrimeTrim. Unlike natural wood, the swelling or increase in thickness is irreversible and results in more water infiltration causing damage to not only the PrimeTrim itself but also any material to which PrimeTrim is attached.

35.     Upon information and belief, despite knowing of these defects in the PrimeTrim, GP has not notified all distributors, contractors, homeowners, subcontractors or purchasers of the PrimeTrim of the defect or provided uniform relief.

36.     For a period of thirty (30) years from the date of original installation, GP warrants that PrimeTrim would not crack, chip, split, or delaminate in a manner that would render the trim materially unable to perform its function; or buckle, shrink or swell in a manner that materially affects its appearance.  GP also warranted that its factory-applied primed coat would not peel, crack or blister from the substrate for a period of eight (8) years after the date of installation.

37.     GP, however, excluded from its warranty any liability for damage to other material which the Prime Trim is attached.

38.     In order to remedy any defect in the PrimeTrim, GP, at its sole discretion, would provide for compensation to the owner of the defective PrimeTrim with either repairing the affected trim, or replacement of the affected trim with trim of the same or similar type and specification (including installation costs), or cash payments to the owner equivalent to the reasonable cost of repair or replacement of the affected trim with similar trim, **provided however**, that the "reasonable cost" of repair or replacement shall not exceed two times the original GP sales price of the affected trim.

39.     On or about June 23, 2008, Plaintiff made a warranty claim to GP under the express warranty for replacement of the PrimeTrim. Plaintiff presented his warranty claim using the Warranty Claim Form provided by GP.

40.     In August 2008, Georgia-Pacific inspected Plaintiff's residence to investigate the warranty claim.

41.     However, Georgia-Pacific failed to resolve Plaintiff's warranty claim as provided in its warranty and as required by the law of the State of North Carolina.

42.     Therefore, GP's express warranty fails of its essential purpose because Plaintiff and owners of homes with PrimeTrim have been required to replace PrimeTrim during the warranty period are being required to pay for more than twice the cost of the original sales price of the affected trim and for damages caused by PrimeTrim to the material to which the PrimeTrim is attached.

43.     In addition to providing an express warranty that fails of its essential purpose, GP also failed to provide adequate instructions for the installation of the PrimeTrim. For example, the PrimeTrim installation instructions are totally devoid of any reference to sealing or to priming any site-cut ends of the boards. "Site-cut" boards are PrimeTrim boards cut at the construction site from their original lengths to lengths needed for their application. Site-cut ends are particularly vulnerable to the entry and entrapment of water.

44.     GP's installation instructions for PrimeTrim advise that "it is essential that good construction practices are followed by proper use of flashing and caulking to prevent moisture penetration and entrapment behind PrimeTrim" and that "moisture trapped in wood for prolonged

periods will cause decay in PrimeTrim."

45. Upon information and belief, the Plaintiff, Plaintiff's Builder, Class Members, Class Members' builders and/or Class Members' contractors, subcontractors, and/or agents utilized and followed the installation instructions provided by GP for the installation of the PrimeTrim that they purchased from GP or its distributors in the construction of Plaintiff's residence and the residences of the Class.

46. GP knew or reasonably should have known that water is expected to enter behind the PrimeTrim in wood frame buildings designed and constructed using typical practices and that it could cause premature failure of the PrimeTrim.

47. Upon information and belief, GP also knew that the PrimeTrim had a history of failures and that the PrimeTrim required more exacting installation than standard construction norms, yet GP failed and/or omitted to inform its distributors, its customers and the eventual owners of the product of these issues and potential remedies or care instructions for these deficiencies.

48. GP knew that Plaintiff, Plaintiff's builder, Class Members, Class Member's builders, contractors, installers or agents would have to cut the PrimeTrim to size on site, otherwise known as "site-cut", yet GP failed to provide adequate instructions as to the need to seal and to prime the site-cut ends of PrimeTrim.

49. As a result of the defects in the PrimeTrim and PrimeTrim's instructions, Plaintiff and the Class have suffered damages, in that they have used PrimeTrim, either directly or indirectly by their contractors, subcontractors, and/or agents, that they would not otherwise have wanted had they known of the defects.

50.     Because the certificate of occupancy was not issued until December 19, 2003, Plaintiff has brought his claims within the six-year statute of repose (G.S. § 1-50(a)(6)) and within the applicable statute of limitations for the claims presented hereunder. Plaintiff has brought his warranty claim prior to the expiration of the warranty. Plaintiff also asserts that this action has been filed within all applicable time frames, whether statutes of repose or statutes of limitations, from the date of initial use or consumption of the PrimeTrim.

## COUNT I – Breach of Express Warranty

51.     The allegations contained in Paragraphs 1 – 50 are incorporated herein by reference as if fully set forth.

52.     As set forth in Exhibit A, GP expressly warranted that the PrimeTrim was appropriate for its intended uses, to wit, "where any high-quality non-structural trim lumber is required" and "is free of defects in materials and workmanship."

53.     PrimeTrim, however, contains and suffers from defects because it prematurely deteriorates, rots, swells, buckles, delaminates, absorbs water, warps, and/or bulges under normal conditions and natural, outdoor exposure; causes consequential water and structural damages; and promotes the growth of mold, mildew, fungi, and insect infestation in the structures in which it is installed. This defect is due to fundamental design, engineering, and manufacturing errors well within GP's area of experience and expertise and which is present when the PrimeTrim leaves GP's control.

54.     In order to remedy any defect in the PrimeTrim, GP, at its sole discretion, would provide for compensation to the owner of the defective PrimeTrim with either repairing the affected

trim, or replacement of the affected trim with trim of the same or similar type and specification (including installation costs), or cash payments to the owner equivalent to the reasonable cost of repair or replacement of the affected trim with similar trim, **provided however**, that the "reasonable cost" of repair or replacement shall not exceed two times the original GP sales price of the affected trim.

55. GP, however, excluded from its warranty any liability for damage to other material which the PrimeTrim is attached.

56. GP also failed to remedy the defective PrimeTrim as set forth in its warranty.

57. The limitations of damages contained in the express warranty provisions are harsh, oppressive and one-sided. The limitations related to the amount of damages, the type of remedies available to Plaintiff and Class Members and the manner of dispute resolution are unconscionable.

58. Plaintiff, who did not directly purchase the PrimeTrim, did not negotiate or bargain for the terms of the express warranty provisions and any purported limitations contained therein. Upon information and belief, the distributors, contractors, and other customers of GP did not and could not negotiate or bargain for the terms of the express warranty provisions and any purported limitations contained therein. Instead, GP stood in a position of domination and control over the terms.

59. Upon information and belief, GP knew that the PrimeTrim had a history of failures, would damage property or material to which it was attached and that it required more exacting installation than standard construction norms, yet GP failed and omitted to inform its distributors, its customers, Plaintiff and Class Members on whose homes the PrimeTrim was applied or installed of

these issues and potential remedies or care instructions for these deficiencies.

60. GP's warranty failed its essential purpose and, therefore, Georgia-Pacific's warranty with Plaintiff and the Class was breached.

61. GP has also breached its express warranty by failing to pay for 100% of the labor costs associated with repair and replacement of the PrimeTrim on Plaintiff's Residence and Class Members residences.

62. GP's failure to remedy the defective PrimeTrim and all associated damages constitutes a breach of express warranty.

63. The foregoing breaches of express warranty at issue were substantial factors in causing damages to Plaintiff and the Class.

64. As a result of the foregoing, Plaintiff and the members of the Class have suffered damages (in the form of, inter alia, out-of-pocket expenditures for replacement PrimeTrim and/or installation of replacement PrimeTrim) that were directly and proximately caused by the defective design and construction of the GP PrimeTrim. Moreover, if Plaintiff and the members of the Class had known the true facts about the defect in the PrimeTrim, they would not have had PrimeTrim installed on their residences, office buildings or other structures.

65. Plaintiff and members of the Class have incurred damages in an amount in excess of $10,000, to be established according to proof.

## COUNT II – Breach of Implied Warranty

66. The allegations contained in Paragraphs 1 - 65 are incorporated herein by reference as if fully set forth.

{00360564.PDF}

67.    GP impliedly represented and warranted that the PrimeTrim was free of defects, merchantable, fit for its intended purpose and fit for the ordinary purposes for which such goods are used.

68.    Upon information and belief, GP has sold, directly or indirectly (through dealers and other retail outlets), thousands of PrimeTrim boards nationwide and in the state of North Carolina to homeowners, developers, contractors and/or subcontractors.

69.    As defined by North Carolina General Statutes § 99B-1, GP is both a "manufacturer" and a "seller."

70.    Upon information and belief, GP, through a distributor, designed, manufactured, marketed, advertised, warranted and sold PrimeTrim to Plaintiff or Plaintiff's builder, Walter Thorpe McCartney ("Plaintiff's Builder"), his subcontractors, and/or agents, and the PrimeTrim was installed on Plaintiff's Residence.

71.    Upon information and belief, GP, through a distributor, designed, manufactured, marketed, advertised, warranted and sold PrimeTrim to Class Members, Class Members' builders, contractors,  subcontractors, and/or agents, and the PrimeTrim was installed on Class Members' Residences.

72.    Upon information and belief, Plaintiff and Class Members are either in privity with GP or are third-party beneficiaries between the contracts entered into between Plaintiff's and Class Members' builders, contractors, subcontractors, and/or agents and GP.

73.    Upon information and belief, Plaintiff and Class Members are third-party beneficiaries of the contracts entered into between GP  and Plaintiff's and Class Members' builders

{00360564.PDF}

because Plaintiff and Class Members receive the direct benefit of those contracts. GP and Plaintiff's and Class Members' builders intended for Plaintiff and Class Members to directly benefit from these contracts given that the Primetrim was to be installed on Plaintiff's and Class Members' homes.

74. Any limitation on the implied warranty of merchantability is unconscionable under all of the circumstances and is unenforceable since GP was aware of the tendency of the PrimeTrim to fail within the warranty period. In addition, GP failed to properly disclaim any purported limitation of liability or damages.

75. GP breached the aforementioned representations and implied warranties, as the PrimeTrim contains and suffers from defects because it prematurely deteriorates, rots, swells, buckles, delaminates, absorbs water, warps, and/or bulges under normal conditions and natural, outdoor exposure; causes consequential water and structural damages; and promotes the growth of mold, mildew, fungi, and insect infestation in the structures in which it is installed. This defect is due to fundamental design, engineering, and manufacturing errors well within GP's area of experience and expertise and which is present when the PrimeTrim leaves GP's control.

76. Plaintiff provided notice to GP of the defects in its PrimeTrim and the breach of the implied warranty of merchantability covering the PrimeTrim and requested that GP repair the defects. In addition, upon information and belief, members of the Class, by virtue of claims for replacement made pursuant to the express warranties, also notified GP of the defects in their PrimeTrim and the breach of the implied warranty of merchantability covering the GP's PrimeTrim. By virtue of the foregoing, GP has received notice of the breach of the warranties.

77. As a result of the foregoing, Plaintiff and the members of the Class have suffered

damages (in the form of, inter alia, out-of-pocket expenditures for replacement PrimeTrim and/or installation of replacement PrimeTrim) that were directly and proximately caused by the defective PrimeTrim. Moreover, if Plaintiff and the members of the Class had known the true facts about the defects in the PrimeTrim, they would not have had PrimeTrim installed on their residences, office buildings or other structures.

78.     Plaintiff and members of the Class have incurred damages in an amount in excess of $10,000, to be established according to proof.

**COUNT III**
**NEGLIGENCE *PER SE***

79.     The allegations contained in Paragraphs 1 - 78 are incorporated herein by reference as if fully set forth.

80.     At the time of construction of Plaintiff and Class Members' residences, the NCRC was the applicable building code. The NCRC incorporates by reference NCAERC, the IBC and the IRC.

81.     Section R701 of the 2002 NCRC states that "The Provisions of this chapter shall control the design and construction of the interior and exterior wall coverings for all buildings."

82.     However, there is no applicable provision in the NCRC regarding the installation or manufacture of PrimeTrim.

83.     The NCAERC states in Section 205.1 Alternative Material, Design and Methods:

> The provisions of this code are not intended to prevent the use of any alternate material, design, or method of construction, provided that the alternate had been reviewed and approved by the Code Enforcement Official at his sole discretion … The Code Enforcement Official may require that sufficient evidence or proof be submitted to

substantiate any claim made regarding the alternative material, design and methods.

84. Section 205.2 Test or Analysis states, "The Code Enforcement Official may require tests, test reports or specific analysis as proof of compliance. . ."

85. However, upon information and belief, GP did not get approval from a Code Enforcement Official to install PrimeTrim on homes.

86. The building code imposes liability on any person or manufacturer who constructs, surpervises construction, or designs a building or alteration thereto, and violates the building code such that the violation proximately causes injury or damage.

87. Even though GP provided purchasers and homeowners with an express warranty, GP was charged by law as a matter of public policy with the duty to comply with all applicable building codes for products installed on homes.

88. Accordingly, GP had a duty to comply with the NCRC and the NCAERC when manufacturing PrimeTrim that would be installed on homes throughout North Carolina.

89. A violation of the North Carolina Building Code constitutes negligence *per se*.

90. Accordingly, Section 205.1 "Alternative Material, Design and Methods" of the Administration and Enforcement Requirements Code states:

> The provisions of this code are not intended to prevent the use of any alternate material, design, or method of construction, provided that the alternate has been reviewed and approved by the Code Enforcement Official at his sold discretion. The Code Enforcement Official may approve any alternate, provided that the alternate, for the purpose intended, is at least the equivalent of that prescribed in the technical codes in quality, strength, effectiveness, fire resistance, durability and safety. The Code Enforcement Official may require that sufficient evidence or proof be submitted to substantiate any claim made regarding the alternative material, design and methods.

{00360564.PDF}

91.     Upon information and belief, GP never received or sought permission from the Code Enforcement Official for PrimeTrim. Further, upon information and belief, GP has no documentation or evidence that PrimeTrim would comply with the building code in terms of "quality, strength, effectiveness, durability and safety" as described in Section 205.1.

92.     GP breached its duty by failing to either seek or receive permission from the Code Enforcement Official or provide a product that would comply with the building code in terms of "quality, strength, effectiveness, durability and safety."

93.     GP knew, or should have known, that its PrimeTrim did not conform to the North Carolina Building Code.

94.     GP had a duty to warn Plaintiff, Plaintiff's builder, subcontractors and/or agents and Class Members, Class Members' builders, subcontractors and/or agents who foreseeably would eventually be harmed by the breach of care and violations of the building code and deficiencies of its PrimeTrim.

95.     As a direct, foreseeable and proximate result of GP's negligence *per se*, Plaintiff and Class Members have suffered damages not only to the PrimeTrim, but more importantly, to portions of their residences.

96.     The damages to other portions of Plaintiff's and Class Members' residences caused by Georgia-Pacific's negligence exceed $10,000.00.

## COUNT IV
## UNFAIR AND DECEPTIVE ACTS AND PRACTICES

{00360564.PDF}

97.     The allegations contained in Paragraphs 1 - 96 are incorporated herein by reference as if fully set forth.

98.     By selling PrimeTrim throughout the State of North Carolina and making representations regarding its product and its warranty, GP has affected commerce and trade within the State.

99.     In selling the PrimeTrim throughout the State of North Carolina and making representations regarding its product and warranty, GP acted in a manner which had the capacity or tendency to deceive and acted unfairly.

100.    Specifically, GP made the following false and deceptive representations in its marketing materials:

    a.      "PrimeTrim offers up to four times more decay resistance than lumber."

    b.      "PrimeTrim outperformed lumber through two years of direct exposure to sun, rain, and snow."

    c.      "PrimeTrim [is] more durable than traditional lumber."

    d.      PrimeTrim has "more than fifteen years with a track record of proven performance."

    e.      "There's virtually no waste due to material defects."

    f.      PrimeTrim "looks great for years without frequent repainting, helping homeowners save money on maintenance."

    g.      "Engineered to withstand sun, rain, snow and time."

101.    In fact, and contrary to GP's representations, PrimeTrim is not more durable than traditional lumber, does not look great for years without frequent repainting or caulking, does not withstand the sun, rain, snow or time.

{00360564.PDF}

–21–

102.     GP has acted unfairly and deceptively by misrepresenting the quality of the PrimeTrim.

103.     GP's omissions, detailed herein and below, were unfair and had the tendency to deceive:

  a.      Failing to warn customers of the design defects and deficiencies in PrimeTrim;

  b.      Failing to provide proper installation instructions;

  c.      Failing to warn and omitting to instruct distributors, contractors and homeowners of the defects and of the special care and installation needed for PrimeTrim; and

  d.      Failing to honor the warranty as a matter of policy;

  e.      Failing to conform to the North Carolina Building Code.

104.     GP either knew, or should have known, that the PrimeTrim was defectively designed and/or manufactured and would allow water intrusion, which would result in severe damages to the homes, such that the homes were not as represented to be by the Defendants as alleged herein.

105.     Upon information and belief, GP knew that at the time PrimeTrim left GP's control, that the PrimeTrim contains a defect because it prematurely deteriorates, rots, swells, buckles, delaminates, absorbs water, warps, and/or bulges under normal conditions and natural, outdoor exposure; causes consequential water and structural damages; and promotes the growth of mold, mildew, fungi, and insect infestation in the structures in which it is installed.  At the time of sale, the PrimeTrim contained design and construction defects that resulted in deterioration and loss of structural integrity.  The defects reduced the effectiveness and performance of the PrimeTrim and rendered it unable to perform the ordinary purposes for which it was used.

106.     Despite the foregoing, GP failed to inform or educate distributors, Plaintiff, Plaintiff's

builder, subcontractors and/or agents as well as Class Members, Class Members' builders, subcontractors and/or agents about the defects and deficiencies regarding the PrimeTrim at the time of selling the PrimeTrim. GP was in a superior position to know the true facts about the hidden defects of the PrimeTrim and the known repercussions to the homes. GP's acts and omissions, detailed herein, had the tendency to deceive distributors, Plaintiff, Plaintiff's builder, subcontractors and/or agents as well as Class Members, Class Members' builders, subcontractors and/or agents and members of the Class and did deceive Plaintiff and Class Members to their detriment.

107. Because GP knew that its PrimeTrim was defective, knew that its warranty failed its essential purpose and would not make Plaintiff or Class Members whole, and breached its warranty by failing to pay for 100% of the labor costs associated with repair and replacement of the PrimeTrim on Plaintiff's Residence and Class Members residences, deception or unfairness was present at both the time of contract formation and at the time of GP's breach of warranty.

108. According to the Court's Order in this matter dated September 30, 2009 on page 15: "As the original owner, Kelly had the opportunity to participate in such risk allocation with an awareness of how such rick allocation impacts the ultimate price of his home." As such, if Plaintiff and Class Members had known the defective nature of the PrimeTrim used on their homes, they would not have purchased their homes, or would have paid a lower price for their homes.

109. GP's actions, as set forth herein, were acts in or affecting commerce and constitute unfair and deceptive trade practices in violation of N.C. Gen. Stat. §§ 75-1.1 et seq.

110. GP's unfair and deceptive trade practices have directly and proximately caused Plaintiff and Class Members' damages in an amount in excess of $10,000.00, said amount to be

proven at the trial of this action.

111.    By reason of the foregoing, Plaintiff and Class Members are entitled to have their damages trebled and have the costs of this action, including reasonable attorney's fees, taxed against the defendants pursuant to N.C. Gen. Stat. § 75-16 and N.C. Gen. Stat. § 75-16.1.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, and on behalf of all others similarly situated, prays for a judgment against GP as follows:

1.    For an order certifying the Class, pursuant to Rule 23, appointing Plaintiff as representative of the Class, and appointing the law firms representing Plaintiff as counsel for the Class;

2.    For compensatory damages sustained by Plaintiff and the Class;

3.    For equitable and/or injunctive relief;

4.    For specific performance of its express warranty;

5.    For treble damages pursuant to Chapter 75;

6.    For payment of costs of suit herein incurred;

7.    For both pre-judgment and post-judgment interest on any amounts awarded;

8.    For payment of reasonable attorneys' fees and expert fees as may be allowable under applicable law; and

9.    For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

This the 30th day of October, 2009.

LEWIS & ROBERTS, PLLC


*/s/ Scott C. Harris*
Daniel K. Bryson
N.C. State Bar No.: 15781
Scott C. Harris
N.C. State Bar No.: 35328
3700 Glenwood Avenue, Suite 410
Raleigh, North Carolina 27612
Telephone: (919) 981-0191
Facsimile: (919) 981-0199


LEA RHINE ROSBRUGH PLLC


*/s/ Joel R. Rhine*
Joel R. Rhine
N.C. State Bar No. 16028
314 Walnut Street
Wilmington, North Carolina  28401-4616
Telephone: (910) 772-9960
Facsimile: (910) 772-9062


Of Counsel

MASON, LLP

*/s/ Gary E. Mason*
Gary E. Mason (to be admitted *pro hac vice*)
Nicholas A. Migliaccio (to be admitted *pro hac vice*)
MASON LLP
1625 Massachusetts Ave., NW
Suite 605
Washington, DC 20036
Telephone: (202) 429-2290
Facsimile: (202) 429-2294

{00360564.PDF}